IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LUBY'S FUDDRUCKERS RESTAURANTS, LLC | § § § | |
| *Plaintiff* | § § | |
| v. | § § | |
| VISA INC., VISA U.S.A, INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, BA MERCHANT SERVICES LLC, BANK OF AMERICA CORPORATION, BARCLAYS BANK OF DELAWARE, CAPITAL ONE, N.A., CAPITAL ONE BANK (USA), N.A., CAPITAL ONE FINANCIAL CORPORATION, CHASE BANK USA, N.A., JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., CITIBANK, N.A., CITIGROUP, INC., FIFTH THIRD BANCORP, FIRST NATIONAL BANK OF OMAHA, HSBC FINANCE CORPORATION, HSBC NORTH AMERICA HOLDINGS, INC., PNC FINANCIAL SERVICES GROUP, INC., SUNTRUST BANKS, INC., SUNTRUST BANK, TEXAS INDEPENDENT BANCSHARES, INC., WELLS FARGO & COMPANY, AND WELLS FARGO MERCHANT SERVICES, LLC | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CASE NO. 17-CV-04555-MKB-JO |
| *Defendants* | § § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff Luby's Fuddruckers Restaurants, LLC f/k/a Luby's Restaurants LP ("Plaintiff")

complains of Visa, Inc., Visa U.S.A., Inc., Visa International Service Association (collectively,

"Visa"), MasterCard Incorporated, MasterCard International Incorporated (collectively,

"MasterCard") (Visa and MasterCard collectively referred to as the "Networks"), BA Merchant Services LLC (f/k/a National Processing, Inc.), Bank of America Corporation, Barclays Bank of Delaware, Capital One, N.A., Capital One Bank (USA), N.A., Capital One Financial Corporation, Chase Bank USA, N.A., JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Citibank N.A., Citigroup, Inc., Fifth Third Bancorp, First National Bank of Omaha, HSBC Finance Corporation, HSBC North America Holdings, Inc., PNC Financial Services Group, Inc., SunTrust Banks, Inc., SunTrust Bank, Texas Independent Bancshares, Inc., Wells Fargo & Company, and Wells Fargo Merchant Services, LLC (collectively, "Bank Defendants") (all collectively, "Defendants")[1] as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      The Defendants have conspired, combined, and made agreements to restrain trade. Visa and MasterCard manage, coordinate, and govern a combination with member banks, including the Bank Defendants, in restraint of trade within the meaning of the Sherman Antitrust Act and the Texas Free Enterprise and Antitrust Act of 1983. The Bank Defendants are (and their predecessors were) members of both the Visa and MasterCard networks, and as such issue both Visa-branded and MasterCard-branded credit and debit cards. The Bank Defendants are independently owned and managed banks and financial institutions that issue credit and debit cards to consumers, but they have agreed to abide by the rules of Visa and MasterCard that forbid the Bank Defendants' competing for merchant acceptance of the credit and debit cards they issue.

---

[1] The Defendants have various predecessors whose liabilities they have assumed. The allegations against such Defendants in this Petition include the activities of such predecessors where applicable.

2

2.      The Bank Defendants issue two main categories of payment cards: credit cards and debit cards. Credit cards are payment cards that allow consumers to make purchases on credit and include charge cards that the full balance to be paid upon receipt of the billing statement. Debit cards, on the other hand, function more like checks and either draw quickly from a consumer's demand account or are prepaid.

3.      The Bank Defendants earn income on credit cards through fees and charges to the cardholder, interest charges on the amount of credit being extended, and from fees and penalties for late payment on card balances. Banks earn income on debit cards through the opportunity to use the funds on deposit in the related accounts and on various fees associated with those accounts. The Bank Defendants also earn income on credit and debit cards through the interchange fees paid by merchants. Interchange fees are imposed on merchants by Visa and MasterCard for the privilege of accepting a credit or debit card as a means of payment, and such fees are paid directly by merchants to the bank that issued the card used as a form of payment. The profitability to issuing banks of credit and debit cards directly increases with the size and frequency of transactions in which the cards they have issued are used.

4.      The Bank Defendants compete with one another to issue cards to consumers (sometimes referred to hereafter as "cardholders") who use those cards to purchase goods and services from merchants. For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash back rewards, points, and other features to compete for cardholders and to induce cardholders to use their cards. The member banks, including the Bank Defendants, do not, however, compete with each other for preferential acceptance by merchants at the point of sale as they should. Competition for such preferential treatment would have resulted in lower prices for both merchants and cardholders, including by giving discounts or

other benefits to preferred cardholders at the point of sale.  Such competition would also enhance the value of these cards to cardholders by stimulating innovation and providing more choices.

5.       Visa and MasterCard have adopted nearly identical rules, which are agreed to by their member banks, including the Bank Defendants, and which are imposed on merchants that accept cards issued by those banks. These rules, or Competitive Restraints, eliminate competition among the member issuing banks for merchant acceptance of credit and debit cards. Nearly all card issuers in the United States are members of Visa and MasterCard, and as a consequence of their agreeing to rules that preclude them from independently competing for merchant acceptance, Visa and MasterCard and their members have obtained and maintained market power in the markets for merchant acceptance of credit and debit cards in the United States, and alternatively, in the markets for merchant acceptance and cardholder issuance of credit and debit cards in the United States. The exercise of this market power has enabled the Defendants to force merchants to pay excessive interchange and network fees. In this manner, the Defendants have unlawfully restrained and continue to unlawfully restrain competition in the credit card and debit card markets.

6.       The principal rules that constitute the Competitive Restraints are the Honor All Cards Rules, the All Outlets Rules, the No Discount Rules, and the No Surcharge Rules. These rules, individually and in combination, have (a) denied merchants the benefits of competition as to the terms, including a fee (if any), for the acceptance of cards of particular issuing banks and (b) preclude card issuers from competing for merchant acceptance of their cards. As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at artificially high levels. Plaintiff has paid and continues to pay significantly higher costs to accept

Visa-branded and MasterCard-branded credit and debit cards in payment for their sales than they would if the banks issuing such cards competed for merchant acceptance.

7.     Because of their participation in the Competitive Restraints through their membership in Visa and MasterCard, the Bank Defendants do not compete for transaction volume by independently competing for merchant acceptance of the cards they issue.

8.     While Visa and MasterCard nominally refer to their interchange fee schedules as setting "default" amounts, suggesting it is possible for issuing banks and merchants to bargain for different interchange rates, the Competitive Restraints prevent such bargained agreements. By setting and enforcing artificially high interchange fees applicable to all merchants that accept cards issued by their members, Visa and MasterCard act as agents of the Bank Defendants for the purposes of exercising the market power gained by their combinations.

9.     If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks and merchants would operate in competitive markets, and merchants would benefit from such competition through lower interchange fees. Collectively set interchange fees do not protect merchants such as Plaintiff or cardholders, but rather allow issuing banks, such as the Bank Defendants, to charge interchange fees far in excess of their costs. In competitive markets, interchange fees would move to competitive levels, and the interchange fees paid by Plaintiff would be substantially below the amounts it has paid since January 1, 2004 if the fee would have been charged at all.  And if merchants had the ability to use competitive strategies with respect to their acceptance of the cards of individual issuers, they would induce competition among issuing banks that would lead to far lower interchange fees. The resulting lack of competition for preferential treatment by merchants at the point of sale also increases costs, stifles innovation, limits choices, and reduces value for cardholders. The

Competitive Restraints have thus harmed both merchants, who pay supracompetitive interchange fees, and cardholders, who both pay higher prices and receive card services of diminished quality and choice.

10.     The Visa Defendants' and MasterCard Defendants' agreements not to compete and price-fixing schemes are naked restraints of trade and *per se* violations of the Sherman Antitrust Act and the Texas Free Enterprise and Antitrust Act.

11.     Even if the Visa Defendants' and MasterCard Defendants' conduct is analyzed under the rule of reason, the substantial harm to competition caused by the cartels violates the Sherman Antitrust Act and the Texas Free Enterprise Act as an unreasonable restraint of trade. None of Defendants' anticompetitive rules and practices is reasonably necessary for the functioning of the credit and debit card networks. Any benefits that Defendants claim are achieved by these restraints of trade can be accomplished by means that are less destructive and harmful to competition. Even if Defendants' restraints have any procompetitive benefit, their anticompetitive effects—massive overcharges to merchants and their customers, higher prices and card services of diminished quality and choice for cardholders, and maintenance of substantial market power—vastly outweigh any such benefit.

12.     The anticompetitive harm to merchants and consumers from Defendants' price fixing and other anticompetitive conduct has been staggering. During the Damages Period, Defendants imposed interchange fees estimated at more than $450 billion on merchants in the United States. Defendants' anticompetitive conduct has also injured competition in the credit and debit card markets by depriving market participants of lower prices as well as innovative new payment options and cost-saving approaches (*e.g.*, to reduce fraud) that would have substantially benefitted U.S. merchants and consumers.

13.     Plaintiff has paid tens of millions of dollars in credit and debit interchange fees to issuing banks that are members of Visa and MasterCard since 2004. Interchange fees are one of Plaintiff's largest operating expense items. Elimination of the Competitive Restraints and restoration of competitive markets for merchant acceptance of credit cards and debit cards would substantially reduce interchange fees, allowing Plaintiff to operate more efficiently and at lower costs, to its benefit and the benefit of its customers, including cardholders. Plaintiff operates in an intensely competitive market and would use the savings from a reduction in its interchange fee costs to increase their competitiveness by enhancing the value its customers and cardholders receive.

### DEFINITIONS

14.     For purposes of this Complaint, the following definitions apply.

    a.     "Acquiring bank" or "Acquirer" means a member of Visa and/or MasterCard that acquires payment transactions from merchants and acts as a liaison between the merchant, the issuing bank, and the Payment-Card Network to assist in processing the payment transaction. Visa and MasterCard rules require that an acquiring bank be a party to every merchant contract. In a typical payment transaction, when a customer presents a Visa or MasterCard card for payment, the merchant relays the transaction information to the acquiring bank.  The acquiring bank then contacts the issuing bank via the network for authorization based on available credit or funds.

    b.     "Credit cards" are payment cards enabling the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards. The credit cards at issue here are general purpose payment cards, as distinguished from private label cards, which can only be used at a single merchant. Payment to a merchant for the goods or services purchased using a credit card is made by the issuing bank of the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the issuing bank and the cardholder. Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer. Credit card issuers compete for consumers by offering a variety of terms and types of cards, which vary by level of rewards, that are intended to induce consumers to use their cards. Cards with a higher level of rewards are often referred to as "premium" cards and carry higher

interchange fees, though they afford no additional benefits to merchants. Credit cards include charge cards, which allow the cardholder to obtain goods or services on credit but require payment in full on a regular basis.

c.    "Debit cards" are payment cards that allow holders of accounts at the issuing bank to pay for goods or services or to obtain cash by directly accessing their accounts. They also include pre-paid cards, which require prepayment of the amount that can be drawn by the user of the card. There are two methods of authenticating debit cards. PIN debit cards require the cardholder to enter a four-digit personal identification number (PIN) to authenticate the cardholder. Signature debit cards usually require the cardholder's signature at the time of the transaction. In the past, some PIN debit cards did not carry interchange fees or were subject to reverse interchange fees — meaning the merchant received a fee for card acceptance. Signature debit cards generally carry higher interchange fees, some of which equal the interchange fees charged for credit card transactions.

d.    "Interchange fee" is the fee that issuing banks are paid by merchants when they accept a credit card or debit card issued by a member of the Visa or MasterCard combinations. Interchange fees are deducted by an issuing bank from the funds owed to a merchant prior to the settlement of a Visa or MasterCard credit card or debit card transaction.

e.    "Issuing bank" or "Issuer" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded payment cards to consumers for their use as payment systems.

## THE PARTIES

15.    Plaintiff's principal place of business is in Houston, Texas.  Plaintiff operates in the restaurant industry under several brands including Luby's Cafeteria, Fuddruckers, Luby's Culinary Contract Services, Cheeseburger in Paradise, Bob Luby's Seafood, Luby's and Koo Koo Roo Chicken Bistro.  Plaintiff was formerly known as Luby's Restaurants LP and acquired Fuddruckers in 2010. Plaintiff's revenue for fiscal year 2016 exceeded $400 million.  Plaintiff accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, Plaintiff has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Plaintiff, therefore, has been injured in its business or property as a result

of the unlawful conduct alleged herein.  Plaintiff seeks to recover damages incurred as a result of the conduct detailed in this Complaint on behalf of itself and on behalf of its franchised stores that have assigned their claims to Plaintiff: Cafe Venture Company, Daltex Restaurant Mgmt., Inc., MCM Restaurants LLC, and MCM Restaurants Del Rio LLC.

16.     Plaintiff has been a class member of the proposed class action captioned: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720-JGJO, United States District Court for the Eastern District of New York. That class action is still pending and no deadline for opting out of the class action bars this action.

17.     Until the corporate restructuring and initial public offering described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California. Defendant Visa U.S.A., Inc. was a group member of Visa International Service Association and was also a non-stock Delaware corporation. Visa U.S.A., Inc. had its principal place of business in San Francisco, California. Visa U.S.A., Inc.'s members were the financial institutions acting as issuing banks and acquiring banks in the Visa system.

18.     Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Defendant Visa Inc. was created through a corporate reorganization in or around October 2007. Visa U.S.A. Inc.'s member banks were the initial shareholders of Visa, Inc.

19.     Defendants Visa Inc., Visa U.S.A., Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.  The Visa entities may be served with process through their registered agent, Corporation Services Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

20.     Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May 2001. Its principal place of business is in Purchase, New York.

21.     Defendant MasterCard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing banks and acquiring banks. Prior to the initial public offering described below, MasterCard International Incorporated was the principal operating subsidiary of MasterCard Incorporated.

22.     Defendants MasterCard Incorporated and MasterCard International Incorporated are collectively referred to as "MasterCard" in this Complaint.  MasterCard Incorporated may be served with process upon its General Counsel and Chief Franchise Officer, Tim Murphy, at 2000 Purchase Street, Purchase, NY 10577 and MasterCard International Incorporated may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

23.     Defendant BA Merchant Services LLC (f/k/a National Processing, Inc.) is an Ohio corporation with its principal place of business in Louisville, Kentucky, and is a wholly owned subsidiary of Defendant Bank of America, N.A., which in turn is a wholly owned subsidiary of NB Holdings, which in turn is wholly owned by Defendant Bank of America Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina. Defendant BA Merchant Services LLC (f/k/a National Processing, Inc.) and Bank of America Corporation are collectively referred to as "Bank of America." Defendants BA Merchant Services LLC, and Bank of America Corporation may be served with process through their registered agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

24.     Bank of America is a member of both Visa and MasterCard.  Between 2000 and 2005 it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that provides card acceptance services to merchants. It is currently and/or has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

25.     MBNA America Bank, N.A. ("MBNA") was a Delaware corporation with its principal place of business in Wilmington, Delaware and a wholly-owned subsidiary of MBNA Corporation, a Maryland corporation with its principal place of business in Wilmington, Delaware.

26.     MBNA was a member of both Visa and MasterCard.  Between 2000 and 2006 it was represented on the MasterCard Board of Directors for the U.S. Regions. It was an Issuing Bank that issued general purpose payment cards to individuals and businesses. It was represented on the Board of Directors of MasterCard. It has had actual knowledge of, and knowingly participated in, the conspiracies alleged in this Complaint.

27.     On January 1, 2006, Defendant Bank of America Corporation acquired 100 percent of the stock of MBNA and assumed its liabilities.

28.     Defendant Barclays Bank of Delaware is a Delaware corporation with its principal place of business in Wilmington, Delaware.  Defendant Barclays Bank of Delaware is also liable for the wrongful conduct of Juniper Bank before Juniper Bank changed its name to Barclays Bank of Delaware in 2006.  Barclays Bank Delaware and Juniper Bank are collectively referred to herein as "Barclays." Barclays may be served with process upon its General Counsel

and Chief Administrative Officer, Clinton Walker, at their corporate headquarters located at 100 S. West Street, Wilmington, DE 19801.

29.     Barclays is currently a member of both Visa and MasterCard and issues credit cards through its Barclaycard division. Barclays has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

30.     Defendants Capital One, N.A. and Capital One Bank, (USA), N.A. are national banks with principal places of business in McLean, Virginia. They are wholly-owned subsidiaries of Defendant Capital One Financial Corporation, a Delaware corporation with its principal place of business in McLean, Virginia. Defendants Capital One, N.A., Capital One Bank, (USA), N.A., and Capital One Financial Corporation are collectively referred to as "Capital One." On July 1, 2007, Capital One F.S.B. merged into Defendant Capital One, N.A. and ceased to exist as a distinct legal entity.  Capital One, N.A. thereby assumed the liabilities of Capital One F.S.B.  Defendants Capital One, N.A., Capital One Bank, (USA), N.A., and Capital One Financial Corporation may be served with process upon their General Counsel, Matt Cooper, at 1680 Capital One Drive, McLean, VA 22102.

31.     Capital One is a member of both Visa and MasterCard. Between 2000 and 2006, it was represented on the MasterCard Board of Directors. It is an Issuing Bank that issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that provides card-acceptance services to merchants. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

32.     Defendant Chase Bank USA, N.A., is a New York bank with its principal place of business in New York, New York.  It is the successor to Chase Manhattan Bank USA, N.A. and is a wholly owned subsidiary of Defendant JPMorgan Chase & Co., a Delaware corporation with

its principal place of business in New York, New York. Defendant JPMorgan Chase Bank, N.A. is a nationally chartered bank operating under the laws of Ohio with its primary place of business in Columbus, Ohio. Defendants Chase Bank USA, N.A., JPMorgan Chase Bank, N.A., and JPMorgan Chase & Co. are collectively referred to herein as "Chase." The Chase Defendants may be served with process through CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

33.     Chase is a member of both Visa and MasterCard. It is an Issuing Bank that issues Payment Cards to individuals and businesses.  Between 2000 and 2003, Chase was represented on the MasterCard Board of Directors for the United States. Between 2003 and 2006, it was represented on the Visa U.S.A. Board of Directors. Chase is currently represented on the Board of Directors of Defendant Visa, Inc.  Moreover, a longstanding Chase senior executive, Charles Scharf, has been installed as the CEO of Visa Inc., and another former Chase executive, Ryan McInerney, has been hired as President of Visa Inc.

34.     In July, 2004, Chase acquired Bank One Corporation and Bank One Delaware, N.A., which also had acted as an Issuing Bank and an Acquiring Bank, and assumed their liabilities. Before the acquisition, Bank One Corporation had actual knowledge of and knowingly participated in the conspiracies alleged in this Complaint. From at least 2000 until its acquisition by Chase, Bank One was represented on the Visa U.S.A. Board of Directors.

35.     Washington Mutual Bank and Washington Mutual, Inc. were Washington corporations with their principal places of business in Seattle, Washington. On October 3, 2005, Washington Mutual, Inc. completed its acquisition of Defendant Providian National Bank. From that date forward, Washington Mutual, Inc. and Providian National Bank are collectively referred to as "Washington Mutual." Between 2002 and 2005 Providian was represented on the

Visa U.S.A. Board of Directors. From 2005 to 2006 Washington Mutual was represented on the Visa U.S.A. Board of Directors.

36.     Through its acquisition of Providian National Bank, Washington Mutual was an Issuing Bank that issued general purpose payment cards to individuals and businesses. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

37.     On September 25, 2008, the Office of Thrift Supervision placed Washington Mutual Bank into receivership, with the FDIC as receiver. The deposits, assets, and certain liabilities of Washington Mutual Bank, including those alleged here, were then immediately acquired by Defendant JP Morgan Chase & Co. On September 26, 2008, Defendant Washington Mutual, Inc. filed for bankruptcy in the District of Delaware.

38.     Defendant Providian National Bank, a national banking association with its principal place of business in Tilton, New Hampshire, was a wholly-owned subsidiary of Defendant Providian Financial Corporation, a Delaware corporation with its principal place of business in San Francisco, California. On October 1, 2005, Defendant Providian National Bank was acquired by Washington Mutual and was renamed Washington Mutual Card Services, Inc. Washington Mutual Card Services, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

39.     Providian was a member of both Visa and MasterCard.  It was an Issuing Bank that issued general purpose payment cards to individuals and businesses. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

40.     JP Morgan Chase Bank, NA acquired the credit card operations and receivables of Washington Mutual Bank from the FDIC on September 25, 2008. By acquiring these assets,

JPMorgan Chase Bank, N.A. became the successor in interest to Washington Mutual and Providian's liabilities that are associated with this litigation.

41.     Defendant Citibank N.A., is a bank with its principal place of business in New York, New York, and is a subsidiary of Defendant Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York. Citicorp merged into Defendant Citigroup, Inc., on August 1, 2005. Defendants Citibank N.A. and Citigroup, Inc. are collectively referred to herein as "Citigroup." Citibank N.A. may be served with process upon its General Counsel, Rohan Weerasinghe, at 399 Park Avenue, 2nd Floor, New York, NY 10022 and Citigroup, Inc. may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

42.     Citigroup is a member of both Visa and MasterCard. It is an Issuing Bank that issues general purpose payment cards to individuals and businesses. It is also an Acquiring Bank that provides card-acceptance services to merchants. It has been and remains represented on the MasterCard. Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

43.     Citibank (South Dakota), N.A. was a South Dakota bank with its principal place of business in Sioux Falls, South Dakota. It was identified in Citigroup's 2007 10-K filing as Citigroup's "primary banking entity responsible for U.S. credit card activities." Until 2006, Defendant Citibank (South Dakota), N.A. was a direct subsidiary of Citibank, N.A. In 2006 Defendant Citibank, N.A. transferred its investment in Defendant Citibank (South Dakota), N.A. to Defendant Citigroup, Inc. Citibank (South Dakota), N.A., with its attendant liabilities, merged into Citibank, N.A. in 2011.

44.     Defendants Fifth Third Bancorp ("Fifth Third") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Fifth Third may be served with process through Corporation Services Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

45.     Fifth Third is a member of both Visa and MasterCard. It is an Issuing Bank that issues Payment Cards to individuals and businesses. From at least 2005 to 2006, Fifth Third was represented on the MasterCard Board of Directors. It is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to merchants. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

46.     Defendant First National Bank of Omaha is a subsidiary of First National Bank of Nebraska, which is a Nebraska corporation with its principal place of business in Omaha, Nebraska. First National Bank of Omaha may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

47.     First National Bank of Omaha is a member of both Visa and MasterCard. Between 2000 and 2006, First National Bank of Omaha or First National Bank of Nebraska was represented on the Visa Board of Directors. It is an Issuing Bank that issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that provides card-acceptance services to merchants. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

48.     Defendants HSBC Finance Corporation and HSBC North America Holdings, Inc. ("HSBC") are Delaware corporations with their principal place of business in Mettawa, Illinois. HSBC Finance Corporation may be served with process through its registered agent CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201 and HSBC North

America Holdings, Inc. by be served through its Senior Executive Vice President and General Counsel, Mark Steffensen at 452 Fifth Avenue, New York, NY 10018.

49.     HSBC is a member of both Visa and MasterCard. HSBC is an Issuing Bank that issues Payment Cards to individuals and businesses. It is currently and/or has been represented on the MasterCard Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

50.     National City Corporation was a Delaware Corporation with its principal place of business in Cleveland, Ohio. National City Bank of Kentucky merged into National City Bank in 2007. National City Bank is referred to herein as "National City."

51.     National City was a member of both Visa and MasterCard. Between 2003 and 2006, it was represented on the Visa Board of Directors. It was an Issuing Bank. National City was also an Acquiring Bank through its former subsidiary, National Processing, Inc. (n/k/a BA Merchant Services LLC), until National Processing, Inc. (n/k/a BA Merchant Services LLC) was purchased by Bank of America in October 2004. Until then, National City was an Acquiring Bank that provided card-acceptance services to merchants. It had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

52.     On October 24, 2008, Defendant PNC Financial Services Group, Inc. executed a stock-for-stock acquisition of National City Corporation, which was supported by the Troubled Asset Relief Program's Capital Purchase Program. National City and its banking affiliates have merged into PNC and assumed the PNC name. As part of this acquisition, PNC assumed the payment-card related assets and liabilities of National City, including the liability to the Plaintiff in this action.   PNC may be served with process through its registered agent Corporation Services Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

53.     Defendant SunTrust Banks, Inc. ("SunTrust") is a Georgia corporation with its principal place of business in Atlanta, Georgia. Defendant SunTrust Bank is a bank operating under the laws of Georgia with it principal place of business in Atlanta, Georgia.

54.     SunTrust is a member of both Visa and MasterCard. Between 2000 and 2006 it was represented on the Visa U.S.A. Board of Directors. Through its subsidiary, Defendant SunTrust Bank, SunTrust is an Issuing Bank that issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that provides card-acceptance services to merchants. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint. Defendants SunTrust Banks, Inc. and SunTrust Bank may be served with process through their registered agent Corporation Services Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

55.     Defendant Texas Independent Bancshares, Inc. is a Texas corporation with its principal place of business in Texas City, Texas. Texas Independent Bancshares, Inc. may be served with process through its registered agent, Christopher Doyle, 3232 Palmer Hwy., Texas City, Texas 77690.

56.     Texas Independent Bancshares, Inc. is a member of Visa and MasterCard. Between 2000 and 2006 it was represented on the Visa U.S.A. Board of Directors. It is currently represented on the Board of Directors of Visa, Inc. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

57.     Defendants Wells Fargo & Company and Wells Fargo Merchant Services, LLC ("Wells Fargo") have their principal place of business in San Francisco, California. The Wells Fargo defendants may be served with process through its registered agent, Corporation Services Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

58.     Wells Fargo is a member of both Visa and MasterCard. During parts of the relevant time period, it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that issues general purpose payment cards to individuals and businesses. Through its "Wells Fargo Merchant Services" division, it is an Acquiring Bank that provides card-acceptance services to merchants. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

59.     Wachovia Bank, N.A. was a North Carolina corporation with its principal place of business in Charlotte, North Carolina. It was a subsidiary of Wachovia Corporation, a North Carolina corporation with its principal place of business in Charlotte, North Carolina. Wachovia Bank, N.A. and Wachovia Corporation are collectively referred to herein as "Wachovia."

60.     Wachovia was a member of both Visa and MasterCard. Between 2002 and 2006, it was represented on the Visa U.S.A. Board of Directors. It was an Issuing Bank that issued Payment Cards to individuals and businesses. It was also an Acquiring Bank that provided card acceptance services to merchants. It had actual knowledge of, and knowingly participated in, the conspiracies alleged in this Complaint.

61.     Wells Fargo has acquired Wachovia's assets and liabilities, including its payment-card operations and associated liabilities, through a stock-for-stock transaction, has become Wachovia's parent corporation and has assumed all of Wachovia's liabilities relating to this action.

62.     The Bank Defendants were or are actual or potential competitors for the issuance of credit cards and acquisition of merchants. All of the Bank Defendants belonged to both networks and have conspired with each other and with Visa and MasterCard to fix the level of interchange fees that they charge to merchants.

63.     Many of the Bank Defendants are, or were during the relevant period, represented on the Visa and/or MasterCard Boards of Directors at the times when those Boards collectively fixed uniform interchange fees and imposed the Competitive Restraints, tying and bundling arrangements, and exclusive-dealing requirements on merchants including Plaintiff. The Bank Defendants delegated to the Visa and MasterCard Boards of Directors the authority to take those actions. Each of the Bank Defendants had actual knowledge of, participated in, and consciously committed itself to the conspiracies alleged herein.

64.     Before Visa's IPO, Section 5.01(a) of the Bylaws of Visa U.S.A. (May 15, 2004) limited seats on its Board of Directors to (i) "officers of [Visa U.S.A.]," (ii) "officers of Charter Members [with some exceptions]...having at least the equivalent rank of Chief Executive Officer or Chief Administrative Officer, or [for larger Member Banks] a person who in their performance of his regular duties reports to such an officer." Individuals who "previously held the title of Chairman, Vice Chairman, or Chief Executive Officer of a Charter Member were allowed to hold the post of "Second Special Director At Large" or "Third Special Director At Large for Technology," provided that the latter was "well qualified in systems and technology issues of importance to [Visa U.S.A.'s] Payment Services." Even after the IPO, representatives of member banks maintain substantial representation on the Board of Visa, Inc.

65.     Similarly, prior to MasterCard's IPO, Article IV-1 of its Bylaws required that each Director "be an officer of a member institution of MasterCard International Incorporated or an individual otherwise uniquely qualified to provide guidance as to the Corporation's affairs." Even after the IPO, the member banks retain substantial representation on Board of New MasterCard.

66.     Bank Defendants are therefore directly responsible for collectively fixing interchange fees within each network and between the two networks. Bank Defendants, acting by and through the Boards of Directors of Visa and MasterCard, are also directly responsible for the tying and bundling of separate and distinct services together in those interchange fees, the imposition of the Competitive Restraints and engaging in the other anticompetitive conduct alleged herein. Collectively, the Bank Defendants, through their operation of Visa and MasterCard, adopted and approved the above-mentioned policies and have significantly profited from those policies.

67.     Even after the corporate restructuring of the Visa and MasterCard networks, the banks continue to conspire to fix interchange fees. Each of the Bank Defendants has agreed that Visa and MasterCard may apply uniform schedules of default interchange fees to their payment card businesses.

## CO-CONSPIRATORS

68.     The United States Court of Appeals for the Second Circuit has noted that Visa and MasterCard "are not single entities; they are consortiums of competitors." Before the corporate restructuring described below, they were "owned and effectively operated by over 22,000 banks, which compete with one another in the issuance of Payment Cards and the acquiring of Merchants' transactions." *United States v. Visa*, 344 F.3d 229, 242 (2d Cir. 2003). Because of the judgment in that case, among other things, Visa and MasterCard and their member banks were exposed as "structural conspiracies" and "walking conspiracies."

## JURISDICTION AND VENUE

69.     The United States Federal Court for the Southern District of Texas has subject matter jurisdiction over the Defendants in this case. The amount in controversy substantially exceeds the jurisdictional requirements of the Court.

70.     The Federal District Court for the Southern District of Texas has personal jurisdiction over Defendants and constitutes proper venue for a trial of this matter because, inter alia, Defendants have: (a) systematically transacted business throughout the Southern District of Texas for years; (b) committed a substantial part of the violations and damages described in this Complaint in the State of Texas and purposely availed themselves of the benefits of Texas law; (c) engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to Plaintiff which is located in and does business throughout Texas, including in the Southern District of Texas; and (d) at least one Defendant maintains its principal place of business in the Southern District of Texas.

71.     Jurisdiction and venue for pre-trial matters are proper in the Federal District Court for the Eastern District of New York pursuant to the Judicial Panel on Multidistrict Litigation Transfer Order dated August 3, 2017.

## FACTS

72.     Before the Visa and MasterCard IPOs in 2006 and 2008, respectively, the Bank Defendants, acting as members of Visa by and through the Visa Board of Directors, fixed uniform interchange fees for various merchants and transactions for all Visa credit card and debit card transactions that they agreed to impose upon merchants and their customers.

73.     The Bank Defendants, acting by and through the Board of Directors of MasterCard, then set similar uniform interchange fees for various merchants and transactions for

all MasterCard credit card and debit card transactions that they agreed to impose upon merchants and their customers.

74.    The Bank Defendants also jointly set interchange fees in both Visa and MasterCard networks to ensure that the interchange fees of Visa and MasterCard increased in parallel and stair-step fashion, rather than decreasing in response to competition from each other.

75.    MasterCard and Visa each changed their ownership structures through initial public offerings wherein the member banks partially divested their ownership of Visa and MasterCard. But the IPOs did not change the essential character of their combinations or the Competitive Restraints. The motivation for these IPOs was to limit the appearance that Visa and MasterCard were controlled by their member banks. According to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard. In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers — or member financial institutions — own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

76.    Each Bank Defendant (and all Visa and MasterCard owner/member banks) knew that all other Visa and MasterCard banks were also delegating their pricing decisions to Visa and MasterCard, which arrangement was ratified by a horizontal agreement of Visa's and MasterCard's owner/member banks when they voted to approve Visa's and MasterCard's IPO restructurings on these bases on the express condition that the rules that form the core of the conspiracy remain in effect for all issuing banks and acquiring banks in the Visa and MasterCard systems. This was a conscious commitment to an ongoing common scheme by horizontal

competitors and, as such, is a continuing violation of the Sherman Antitrust Act and the Texas Free Enterprise Act. It maintained the anti-competitive, pre-IPO status quo: Visa and MasterCard continue to set interchange fees for thousands of competing banks that, but for these conspiracies, would have independently competed for merchant acceptance of their payment cards.

77.     After the IPOs, neither Visa, MasterCard, nor any of the member banks, including the Bank Defendants, took any affirmative action to withdraw from the respective combinations. To the contrary, even after the IPOs, the member banks of Visa and MasterCard continued to agree to, enforce and adhere to the Competitive Restraints that eliminate competition among issuing banks for merchant acceptance.

78.     Bank documents show that the IPOs perpetuated the conspiracies—which continue uninterrupted to this day. Visa CEO Charles Scharf conceded as much when, five years after Visa's IPO, he characterized Visa's rules as having "stood in the way of [Issuers and Acquirers] working together to do something positive for the merchant." MasterCard's rules also barred such positive competition.

79.     The IPOs actually increased the effectiveness of Defendants' price-fixing conspiracies as well as Visa's and MasterCard's substantial market power by consolidating decision-making and coordinating communications among the conspirators. Visa's and MasterCard's economists opined in 1993—well before these IPOs were being considered—that "[t]here would be far less competition in this industry if Visa and MasterCard had chosen to operate as single companies." David S. Evans and Richard L. Schmalensee, *The Economics of the Payment Card Industry*, at 103 (1993).

80.     After the IPOs, as before, Visa and MasterCard serve as facilitators and coordinators of horizontal agreements among their member banks to continue to adhere to and enforce "default" interchange fees and the Competitive Restraints. The Bank Defendants and other member banks continue to act as information conduits for the sharing of pricing and other competitive information between the Visa and MasterCard networks, thereby ensuring that the networks' interchange fees continue to increase in parallel and stair-step fashion.  It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks also to impose and adhere to those restraints. Visa and MasterCard, by acting as the managers of their respective combinations and coordinating agreements to continue imposing and adhering to the Competitive Restraints, eliminate competition for merchant acceptance among their respective issuing banks. But for the arrangements facilitated by Visa and MasterCard and the agreement by the Bank Defendants to those arrangements, the member banks would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

81.     However, the member banks do not compete for merchant acceptance of the cards they issue.  Instead, both before and after the Visa and MasterCard IPOs, the member banks have ceded to Visa and MasterCard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue. By continuing to agree to and adhere to the Competitive Restraints and default interchange fees, the member banks, including the Bank Defendants, have deprived the marketplace of independent centers of decision-making and, therefore, of actual or potential competition.

A.    **Antitrust Market Definition**

82.    The relevant product markets are (1) the market for merchant acceptance of credit cards and (2) the market for merchant acceptance of debit cards. Credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender. These markets are each part of two-sided platforms that involve (a) merchant acceptance of payment cards and (b) banks issuing payment cards and gaining depository accounts. The market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards are in themselves relevant markets even if the effects from the other side of the platforms (competition for issuing payment cards and gain depository accounts) are considered.

83.    Banks compete with one another to issue their cards to consumers who use those cards to purchase goods and services from merchants. But, like in the relevant markets for merchant acceptance of credit cards and merchant acceptance of debit cards, competition for issuing payment cards to consumers is constrained by the Competitive Restraints and supracompetitive interchange fees.  Absent the Competitive Restraints, banks issuing such cards would compete over the terms of acceptance of their cards by merchants to get merchants to accept their cards as payment for the goods and services the merchants sell to consumers and thus enhance the value of these cards to cardholders, reduce cost of purchases, and increase innovation. Therefore, anticompetitive effects exist on both sides of the two-sided platform.

84.    A credit card is not interchangeable with a debit card or other form of tender, so merchant acceptance of credit cards and merchant acceptance of debit cards are separate relevant markets. Credit cards give cardholders the ability to access a line of credit, defer payment, and other features that are not available through debit cards or other forms of tender. For this reason, Plaintiff and other merchants cannot discontinue acceptance of credit cards without losing sales,

even in the face of high or increasing interchange fees. Visa and MasterCard and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options. Debit cards are also regulated separately and differently from credit cards. In 2011, pursuant to the Durbin Amendment, the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks. The legislation did not mandate that the Federal Reserve Board regulate interchange fees charged in connection with credit card transactions.

85.     Likewise, in the market for merchant acceptance of debit cards, a debit card is not interchangeable with a credit card or other form of tender. Debit cards must be tied to a bank account, or be pre-paid, unlike credit cards. When a debit card is used, the funds are withdrawn from the cardholder's account either the same day or within a few days. Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks on their person, and not all merchants accept checks. Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options. Because credit cards are not a substitute for debit cards on the cardholder side of this platform, Plaintiff and other merchants cannot discontinue acceptance of debit cards, or substitute credit card acceptance for debit card acceptance without losing sales, even in the face of high or increasing interchange fees. Visa and MasterCard and their debit card issuing members are not constrained in the charges they impose for merchant acceptance of debit cards by the availability of credit cards or other forms of tender.

86.     Even though merchant acceptance of credit cards and debit cards is one side of a two-sided platform involving cardholders in payment transactions, the relevant markets here should not include the separate markets for issuing credit cards and debit cards to consumers. As

explained *supra*, Visa and MasterCard operate as a 5-party payment card system, involving as many as 5 distinct entities (cardholder, issuer, networks, acquirer, and merchant), and have imposed horizontal restraints in the form of collusively set interchange fees. Visa and MasterCard do not operate to set prices based on upon considerations of merchant and cardholder demand.  Rather, they facilitate and impose Competitive Restraints that prevent member banks from competing for merchant acceptance of payment cards.  In this context, the Defendants' Competitive Restraints and default interchange fees are not necessary to maintain cardholder satisfaction and use.  Visa and MasterCard member issuing banks are able to fund, and would fund, rewards to cardholders from interest charged on cardholder account balances and fees, which account for the vast majority of the issuing banks' payment card revenues.[2]

87.     The relevant markets for merchant acceptance of credit cards and merchant acceptance of debit cards in the subject 5-party system with horizontal restraints are readily distinguished from the relevant market in a 3-party payment card system, for example, that involves a single entity acting as issuer, network, and acquirer with vertical price restraints such as rules imposed by American Express.

88.     However, depending on the facts presented at trial, because merchant acceptance and cardholder issuance occur across a two-sided platform involving merchants and cardholders, the relevant markets in this case may, in the alternative, be (1) the market for merchant acceptance and cardholder issuance of credit cards and (2) the market for merchant acceptance and cardholder issuance of debit cards.  Still, separate markets for credit cards and debit cards are

---

[2] As much as 90% of issuing bank revenue on card portfolios comes from interest on revolving balances and fees such as annual fees, over limit fees, late fees, bad check fees, cash advance transaction fees, foreign exchange fees, and fees for optional protection programs such as insurance. Issuing banks could use these significant sources of revenue to fund cardholder rewards, even with reduced or no interchange fee income.

warranted.  For both merchants and cardholders, credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender. And merchants cannot discontinue accepting either credit or debit cards, or substitute one for the other, without losing sales even in the face of high and increasing interchange fees.  Visa and MasterCard and their payment card issuing banks are not constrained in the charges they impose for merchant acceptance of credit cards or debit cards by the availability of those alternative payment options or other forms of tender.

89.     The relevant geographic market is the United States and its territories.

**B.      The Competitive Restraints**

90.     On behalf of, and in agreement with, member banks and Bank Defendants, Visa and MasterCard each have adopted and imposed supracompetitive "default" interchange fees and other Competitive Restraints on Plaintiff that eliminate competition. These Competitive Restraints prevent competition among the issuing banks for transaction volume from merchants. As a result, the Competitive Restraints cause Plaintiff's costs of acceptance to be higher than would prevail in a competitive market.  The Competitive Restraints have also restrained issuing banks from competing for cardholders by offering benefits at the point of sale.  Cardholders will not realize key benefits until both horizontal cartels at Visa and MasterCard are finally eliminated. Until then, cardholders will continue to get less choice, less quality, and pay higher prices.  While competition would have motivated rival issuing banks to charge lower fees than the default interchange fees in order to differentiate themselves for cardholders through bilateral arrangements with merchants, they have never done so because the Competitive Restraints eliminated any incentive for issuing banks to charge fees below the anticompetitively high levels being fixed by the conspiracies.

91.     In order to identify any cartel members "cheating" by secretly offering lower interchange fees, Visa and MasterCard monitors each transaction to ensure application of the appropriate interchange fee. At the same time, since at least 2004, Visa's and MasterCard's rules required all Issuers and Acquirers to adhere to all network rules.[3]  Owner/member banks that violated any of these network rules were subject to fines and even expulsion from Visa and MasterCard, and, by rule, the Networks could not be held liable by these banks.[4] This enabled Visa and MasterCard to monitor compliance with, and enforce, the rules of their respective cartels. These rules remain in place to this day.[5]

92.     <u>Collective Setting of Interchange</u>: Prior to the IPOs, Bank Defendants, acting through the Visa and MasterCard Boards of Directors, collectively adopted and enforced rules that require the payment of an interchange fee, set at Visa and MasterCard's uniform levels, for all transactions on the respective networks. While there were different fees within a given default interchange fee schedule, every Issuer applied the same fee schedule to a given transaction. It is

---

[3] *See, e.g.*, Visa Rule 1.2.A (Member Responsibilities), *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 1.5.5 (Member Responsibilities), *MasterCard Rules* (Oct. 2008).

[4] *See, e.g.*, Visa Rule 1.7 (Regulation Enforcement), *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); Visa Core Principles Ch. 1 (Visa Operating Regulations Governance) and 2.3 (General Liabilities and Indemnifications), *Visa International Operating Regulations* (Oct. 15, 2010); MasterCard Rules 3.1 (Standards), 3.1.2 (Failure to Comply with a Standard), and 3.3 (Indemnity and Limitation of Liability), *MasterCard Rules* (Oct. 2008).

[5] *See, e.g.*, Visa Rules 1.1.1.1 (Applicability of Rules), 1.1.1.10 (Visa U.S.A., Inc. Member Responsibilities – US Region), 1.1.9 (Liabilities and Indemnifications) and 1.12.3 (Non-Compliance Assessments), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); MasterCard Rules 2.1 (Standards), 2.1.2 (Failure to Comply with a Standard), 2.2 (Conduct of Activity and Digital Activity), 2.2.1 (Customer Responsibilities), and 2.3 (Indemnity and Limitation of Liability), Ch. 2—Standards and Conduct of Activity and Digital Activity, *MasterCard Rules* (July 7, 2016).

this collusion by every Issuer to set identical default interchange fee schedules that constitutes price fixing.  Even after the IPOs, the Bank Defendants agree to abide by these rules.

93.    Absent the Competitive Restraints, Plaintiff would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks, including the Bank Defendants, for merchant acceptance. But in the cartelized markets created by the Visa and MasterCard combinations, Visa and MasterCard, acting with and for the Bank Defendants and other member banks, establish interchange fee schedules for their member banks.[6] Plaintiff has been, and continues to be, injured by this collective setting of interchange fees by Visa, MasterCard, and the Bank Defendants.

94.    <u>Honor All Cards Rules</u>: These rules require in relevant part that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, no matter which bank issued the card or the card type. Similarly, a merchant that accepts Visa-branded or MasterCard-branded debit cards, must accept all Visa-branded or MasterCard-branded debit cards, no matter the issuing bank. Because of the Honor All Cards Rules, Plaintiff cannot reject any or all of the types of cards issued by any particular issuing bank. Thus, Plaintiff is precluded from gaining the benefits of competition as to the terms upon which they will accept or reject the cards of any issuing bank that is a member of Visa or MasterCard. As a result, the "default" interchange fees become binding on Plaintiff.

95.    By barring merchants from steering customers to a less expensive Issuer, Issuers need not worry about losing business to a lower-cost competitor because all cards issued by

---

[6] *See, e.g.*, Visa Rule 9.5 (Interchange Reimbursement Fees), *Visa U.S.A. Inc. Operating Regulations, Volume 1— General Rules* (Nov. 15, 2008); Visa Rule 9.1.1.3 (Visa Determines and Publishes IRF), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); MasterCard Rule 9.4 (Interchange and Service Fees), *MasterCard Rules* (Oct. 2008); MasterCard Rule 8.3 (Interchange and Service Fees), Ch. 8—Settlement and Related Obligations, *MasterCard Rules* (July 7, 2016).

every Issuer must be accepted at the default interchange fee rates. Thus, a merchant that must accept a Visa Signature Preferred Card transaction, which may bear an interchange fee ranging from 2.10% to 2.95% (plus $0.10), cannot attempt to steer consumers to cheaper payment cards or even to cheaper Visa (or MasterCard) standard credit cards, for which the merchant would pay substantially lower, but still supracompetitive, interchange fees. Because of the Honor All Cards rules and related Competitive Restraints, Issuers have no incentive to enter into bilateral agreements outside the conspiracy; *i.e.*, Issuers are incentivized not to "cheat" on the price-fixing scheme. Thus, the default interchange fees have become a price floor.

96.     By enacting and enforcing the Honor All Cards Rules and interchange fee payment rules noted above, the Defendants have created a situation in which the payment of an interchange fee is required on all transactions, regardless of the issuing bank. Because of this problem – a problem entirely of Defendants' own creation – Defendants have claimed that uniform schedules of default interchange fees actually benefit merchants by preventing the issuing bank from "holding up" the merchant by demanding an interchange fee that is as high as the Issuer would like, knowing that the Honor All Cards Rules prevent the merchant from refusing that transaction.[7]

---

[7] *Also See, e.g.*, Visa Rule 5.2.B (Honoring Cards), *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); Visa Rule 1.5.4.5 (Honor All Cards – US Region), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); MasterCard Rules 5.6.1 (Honor All Cards) and 11.5C.2 (U.S. Region Variances to Global Rules) (including 11.5C.2.2 (Honor All Debit MasterCard Cards) and 11.5C.2.3 (Honor All Other MasterCard Cards)), *MasterCard Rules* (Oct. 2008); MasterCard Rule 5.10.1 (Honor All Cards), Ch. 15—United States Region, *MasterCard Rules* (July 7, 2016).  Visa's Operating Regulation 5.2.B.3.a. requires merchants that accept Visa payment cards to accept all Visa cards within the "categories of acceptance" that it accepts, regardless of the identity of the issuing bank or the level of interchange fee it charges.  Similarly, Rule 9.1 of MasterCard's Bylaws and Rules requires merchants that accept MasterCard-branded Payment Cards to "honor all valid MasterCard cards without discrimination when properly presented for payment."

97.     This "hold-up" problem is the result of the Bank Defendants' anticompetitive agreements not to compete for merchant acceptance such as the Honor All Cards rules. Attempting to justify interchange fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as Defendants have sought to do, is perverse. Price fixing in tandem with an agreement not to compete is not a justification for anticompetitive conduct. It is anticompetitive conduct.

98.     Moreover, these schemes create a staggering amount of anticompetitive harm. Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive problem created by the schemes themselves) was credited as a procompetitive benefit—which it should not be—any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Complaint. Such harm includes higher fees to merchants, and higher prices and a loss of choice and innovation for cardholders.

99.     Visa and MasterCard have also argued that the Honor All Cards rules are necessary for their networks to function because, without them, universal acceptance of their credit and debit cards cannot be assured. Visa's and MasterCard's conduct reveals the pretextual nature of that justification. Visa and MasterCard have permitted numerous products that function at only a subset of the locations that accept Visa and MasterCard credit and debit cards, and the introduction and proliferation of those products have not harmed the operation of their networks. These include selective acceptance (or selective-authorization) cards, which can be used only at certain merchant locations, even though they bear the Visa or MasterCard logos that supposedly connote universal acceptance of all the Visa or MasterCard brand's cards. Other examples include the increasingly prominent flexible-spending-account cards and health-reimbursement-account cards, among others.

100.    More importantly, Visa and Chase recently entered into an arrangement that gave Chase the ability to differentiate Chase-branded Visa credit and debit cards from other Visa credit and debit cards via bilateral agreements with certain merchants ("ChaseNet"). ChaseNet was designed to preserve the conspiracy while accommodating, to a limited degree, Chase's desire to compete for cardholders by differentiating its products from other Visa (and MasterCard) Issuers. The ChaseNet agreement preserved the two linchpins of the horizontal conspiracy—the Honor All Cards and default interchange fee rules—while also preserving the prohibition against surcharging by Issuer.  This material (albeit highly limited) deviation from the Honor All Cards rules reinforces the conclusion that such rules are not necessary for a general purpose payment card network to function. Moreover, even if the Honor All Cards rules have some legitimate rationale, those objectives could be realized through less restrictive means.

101.    In addition, in early 2013, during the time frame Visa was negotiating ChaseNet, Visa began allowing discounting by Issuer at the point of sale.[8] This represented a material departure from Visa's previous rules, which prohibited effective differentiation by Issuer at the point of sale or point of interaction, by discounting or otherwise. MasterCard continues to

---

[8] *See, e.g.*, Visa Rule ID#: 150413-010213-0027555 (Discounts, Offers, or In-Kind Incentives (New)), *Visa International Operating Regulations* (Apr. 15, 2013), *Ch. 6—Payment Acceptance—Honoring Cards—Discount at the Point of Sale* ("Effective 1 February 2013, except where prohibited by applicable laws or regulations, a Merchant may provide Cardholders with a discount, promotional offer, or in-kind incentive at the point-of-sale that is not available for other Visa Cards."); *see also* Visa Rules 1.5.4.11 (Uniform Services – Acquirer Requirements (Updated)), 1.5.4.12 (Uniform Services – Merchant Requirement), 1.5.4.13 (Discount Offer – US Region and US Territories), 3.1.1.2 (Affinity/Co-Brand Program Positioning and Advertising), 4.1.1.1 (Visa Card Product and Token Positioning (Updated)), 4.1.1.3 (Non-Standard Card Prohibitions), 4.1.1.4 (Positioning, Acceptance, and Accounts – US Region), 5.4.1.2 (Uniform Services Merchant Requirement – US Region), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016).

prohibit discounting by Issuer at the point of sale.[9] Visa's rule change further shows that the various rules, including the Honor All Cards rules, barring differentiation at the point of sale by Issuer cannot be justified. Those rules include the prohibition against surcharging by Issuer, which both Visa and MasterCard maintain to this day. Until Visa and MasterCard repeal all the rules that bar Issuers from competing for cardholders through direct agreements with merchants—including the Honor All Cards rules and all rules that bar Issuer differentiation at the point of sale—and repeal the default interchange fee rules, merchants will continue to pay supracompetitive interchange fees, including for Chase transactions.

102.    On an investor call in May 2013, during which ChaseNet was discussed, Visa CEO Charles Scharf admitted that Visa's rules had barred Issuers from competing for merchant acceptance. When asked about Visa's arrangement with Chase, Mr. Scharf stated: "The reality is I think if you go around and talk to most issuers, they would probably say that there wasn't a lot of conversation that went on between the issuing and acquiring [*i.e.*, merchant] side, partially because of our rules that stood in the way of them working together to do something positive for the merchant." Visa Inc. Q2 2013 Earnings Call Transcript, *FactSet CallStreet* (May 1, 2013), at 16 (emphasis added). Those rules (with the exception of the rules now allowing discounting by Issuer at the point of sale, in the case of Visa) continue to stand in the way of banks "working together to do something positive" for merchants.

103.    Those rules have also stood in the way of Issuers doing "something positive" for cardholders. Even though Chase continues to participate in the conspiracy, its internal documents highlight the many ways cardholders would have benefitted if Issuers had been permitted to truly

---

[9] *See, e.g.*, MasterCard Rule 5.11.1 (Discrimination), Ch. 16—Additional U.S. Region and U.S. Territory Rules, *MasterCard Rules* (July 7, 2016).

compete for merchants and cardholders through agreements that permitted differentiation at the point of sale.

104.   <u>All Outlets Rules</u>: The All Outlets Rules require merchants who accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations. A merchant is not permitted to accept the cards at some stores but not others. These rules preclude merchants from gaining the benefits of competition as to the terms of acceptance by location.

105.   Prior to January 27, 2013, the All Outlets Rules required merchants that operated under multiple banners (e.g., trade names or name plates) and that accepted Visa-branded or MasterCard-branded payment cards to accept those cards at all of their banners. This rule precluded merchants from gaining the benefits of competition as to the terms of acceptance with issuing banks by banner or by locations within a banner. As a result, Plaintiff could not indicate it would terminate acceptance of the cards of a particular issuing bank at some of their banners in order to promote competition as to fees.

106.   Changes that Visa and MasterCard made to their All Outlets Rules implemented after January 27, 2013, do not diminish the anticompetitive effects or the injuries Plaintiff continues to suffer. The All Outlets Rules still require that if a merchant elects to accept Visa-branded or MasterCard-branded cards at one of its banners, it must accept all such cards at all locations of that banner, and it must accept all such cards no matter the card issuer. Merchants also cannot accept the cards of some issuers but not others at a particular location.

107.   <u>No Discount Rules</u>: Under the No Discount Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a payment card. However, pursuant to a settlement with the United States Department of Justice, as of July 20, 2011, Visa

and MasterCard changed their rules to allow merchants to offer discounts to consumers in some limited circumstances. These changes to the No Discount Rules have not significantly diminished the anticompetitive effects of the Competitive Restraints. While Visa and MasterCard now allow merchants more discounting options, merchants still are prohibited from offering discounts to consumers for using the cards issued by particular issuing banks. A merchant's ability to utilize issuer-specific discounts would be an important tool for gaining the benefits of competition as to the terms of acceptance with an issuing bank.

108.   <u>No Surcharge Rules</u>: The No Surcharge Rules prohibit Plaintiff from surcharging transactions in which a consumer used a Visa-branded card or a MasterCard-branded card. These rules eliminate a merchant's ability to utilize surcharging as a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank. Absent the rules, a merchant could surcharge a transaction in which the consumer uses the card of a particular issuing bank, such as one that demanded a high interchange fee. As of January 27, 2013, Visa and MasterCard altered their No Surcharge Rules to permit merchants to surcharge credit card customers under limited circumstances. Debit card transactions still may not be surcharged under the rule modification. Changes to the No Surcharge Rules for credit cards implemented after January 27, 2013 do not eliminate their anticompetitive effects or the injuries Plaintiff continues to suffer.

109.   Under Visa's and MasterCard's now-current anti-surcharging rules, merchants accepting American Express credit cards must limit their surcharging of Visa/MasterCard credit cards to the same terms that American Express limits surcharging of American Express credit cards. American Express prohibits surcharging its credit cards unless all payment cards, including debit cards, are also equally surcharged, but Visa and MasterCard do not permit debit card surcharges. To avoid this effective bar against surcharging, a merchant must stop accepting

American Express credit cards, an outcome that would only reinforce Visa's and MasterCard's substantial market power. This Catch-22 effectively prohibits credit card surcharging by merchants that accept American Express: 90% of merchants by U.S. credit card volume. Moreover, the remaining 10% of merchants that theoretically could surcharge are unlikely to do so, because they will risk losing sales to competing merchants that accept American Express and therefore cannot surcharge. Moreover, even as modified, the No Surcharge Rules prohibit a merchant from surcharging based on the identity of the card issuer.[10]

110.   <u>Visa and MasterCard Duality</u>:  Since 1976, Visa's and MasterCard's rules have permitted banks to be members of both Visa and MasterCard and issue both brands of credit cards. This is referred to as "Issuance Duality." Banks could also "acquire" transactions from merchants for both Visa and MasterCard. This is referred to as "Acquiring Duality." Every major bank in the United States is a member of both Visa and MasterCard, and thus has the right to issue payment cards and acquire merchants for both the Visa and MasterCard networks. The U.S. memberships of Visa and MasterCard are virtually identical. Furthermore, virtually every merchant that accepts Visa payment cards as a form of payment also accepts MasterCard payment cards.

111.   Very few exceptions to Duality exist among the thousands of financial institutions that issue Visa and/or MasterCard Credit Cards and the financial institutions that acquire retail stores for Visa and/or MasterCard.  Each of the Bank Defendants is a member of both networks.

---

[10] *See, e.g.*, Visa Rule 1.5.5.2 (Surcharges), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); MasterCard Rule 5.11.2 (Charges to Cardholders), Chs. 5—Acquiring and 16—Additional U.S. Region and U.S. Territory Rules, *MasterCard Rules* (July 7, 2016); Visa Rule 5.6.1 (Surcharges – Allowances, Requirements, Restrictions, Amounts, and Disclosures) (including Visa Rules 5.6.1.1–5.6.1.5), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); MasterCard Rule 5.11.2 (Charges to Cardholders), Ch. 16—Additional U.S. Region and U.S. Territory Rules, *MasterCard Rules* (July 7, 2016).

112.    Although Visa's rules prohibit banks from issuing both Visa and MasterCard offline debit cards, virtually all Visa check card-issuing banks are members of MasterCard and virtually all MasterCard debit-issuing banks are members of Visa. Therefore, many of the debit card operations of the networks are transparent to the competing network, and the debit card issuing banks of the Visa and MasterCard networks have a profit motive to restrain inter-network competition that might result in lower interchange fees.

113.    Visa and MasterCard member banks have historically exerted control over the operations of the competing Visa and MasterCard networks by simultaneously participating on the Boards of Directors and other important committees of the two networks. For example, MasterCard's Business Committee and Visa's Marketing Advisors Committee advise their respective network's professional staff and management on key strategic and competitive issues. In 1996, 12 of the 21 banks represented on Visa's Board of Directors were also represented on MasterCard's Business Committee, and 17 of the 27 banks on MasterCard's Business Committee had representatives on Visa's Marketing Advisors Committee. Seven of the 22 banks represented on MasterCard's Board of Directors also were represented on Visa's Marketing Advisors Committee.

114.    As of year-end 1996, approximately 19 banks had a representative on both the Board of Directors of one network and at least one important committee of the other network.

115.    Most of the Bank Defendants have one or more employees tasked with being the bank's liaison to the networks. Oftentimes, the same employee or employees act as liaisons to both networks.

116.    Visa, MasterCard, and the Bank Defendants abuse the structure of duality to pass sensitive information between the two networks, which helps guarantee that the networks' interchange fees continue to increase in parallel and stairstep fashion.

117.    The member banks' participation in the governance and operations of the competing networks has continued into the relevant time period in this lawsuit. For example, in 2006, five of the eight bank representatives on the Visa U.S.A. Board sat on a MasterCard advisory board or council. In addition, five out of 13 banks that were represented on the U.S. Board of Directors of MasterCard had a representative on at least one of Visa U.S.A.'s executive councils. The situation of Defendant Chase illustrates the influence of a given member bank over the affairs of both networks. In 2006, Chase sat on seven advisory boards of MasterCard at the same time as it was represented on Visa's board.

118.    The advisory boards, in which Chase employees participated, or in which "open" seats were available to Chase, related to important aspects of MasterCard's business and included the following: U.S. Business Committee, Commercial Card Business Committee, Acquiring Committee, Debit Advisory Committee, Legal Advisory Committee, and the International Security Committee and International Operations Committee of MasterCard International.

119.    In 1992, MasterCard International's Executive Vice President and General Counsel wrote to the Department of Justice that "when one board acts with respect to a matter, the results of those actions are disseminated to the members who are members in both organizations. As a result, each of the Associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment." High-ranking Visa executives have also noted the anticompetitive effects of the banks'

longstanding dual membership in and ownership of Visa and MasterCard. For example, in 1992, Visa International's former President and CEO explained that "Visa was a better organization [before its owners acquired an interest in MasterCard. [I]t created more, it was more innovative, it was more vital and more imaginative. . . . The real creativity, ingenuity, desire to develop, [and] support from members that made Visa what it is today came before duality because there were groups of banks who wanted to support Visa to go beat up on MasterCard, and there were groups of banks in MasterCard who wanted to support MasterCard to go beat up on Visa. And they weren't sitting there as shareholders of both organizations not really caring who beat up on whom or if they didn't beat up on anyone or not caring who won. If you've got one foot firmly placed on both sides of the street, who cares. . . . [a]nd I think that not only would the banks have benefited had they gone this way [without duality], but ultimately the consumer would, too . . . ." Compl. ¶ 60, *United States v. Visa U.S.A., Inc. et al.*, No. 98-civ.7076 (S.D.N.Y. Oct. 7, 1998). That same year, Visa International's Executive Vice President and General Counsel testified that "it is very difficult for us to take a step, an aggressive step that hurts MasterCard because the same banks who sit there on the board, who are in Visa are also in MasterCard." In response to the question whether "duality has led to a decrease in intersystem competition between Visa and MasterCard," he replied, "Absolutely," and when asked whether duality harmed consumers, he answered "I think in the long run they would be better off without duality . . . ." *Id.* ¶ 61.

120.     Before their respective IPOs, the networks were essentially controlled by a small number of member banks — those with the largest shares of card issuance and with the highest sales-transaction volumes — including each of the Bank Defendants. These banks established their control by simultaneously serving on the Boards of Directors and/or important committees of either or, in many cases both, Visa and MasterCard. This relationship among member banks

and the networks has lessened competition between Visa and MasterCard because it makes the member banks less willing to implement policies that would increase competition between Visa and MasterCard for the business of merchants. Defendants also instituted a number of ownership and control restrictions to preserve the banks' control, even after the IPOs.

121.     The member banks of Visa have exacerbated the effects of duality by causing Visa to enact, publicize and adhere to a policy that Visa "will not be disadvantaged" on interchange fees vis-à-vis MasterCard and American Express. Similarly, the member banks of MasterCard have caused MasterCard to adopt a policy of engaging in "competitive response" to increases in Visa's interchange fees by "matching" Visa's effective interchange rates, which guarantee that its Interchange Fees do not fall out of line with Visa's. By causing Visa and MasterCard to adopt these twin policies, the member banks have enabled the networks to agree on levels of interchange fees to be paid by merchants. Since the explicit adoption of these policies, the average effective interchange rates of Visa and MasterCard have been virtually identical. When the banks, acting through Visa, adopted schedules of uniform interchange fees to be applied to all Visa transactions, they understood that the same banks, acting through MasterCard, would match the effective interchange fees reflected in the Visa schedules.

122.     The Networks are aware of each other's policies through communications with their dual member banks.

123.     Because MasterCard knows that Visa's policy is to not be disadvantaged, it knows that Visa will match any interchange fee increase that it announces. Similarly, because Visa knows that MasterCard will make a "competitive response" to its interchange fee increases by "matching" those increases, it understands that its interchange fee will not place it at a competitive disadvantage for merchant acceptance. Thus neither Visa nor MasterCard has an

incentive to compete for merchant acceptance based on interchange fee levels, and their member banks have the incentive to cause both Visa and MasterCard to continuously increase interchange fees. Industry-wide knowledge of the Visa and MasterCard policies has led the banks and the networks to a meeting of the minds that Visa and MasterCard will match each others' effective interchange fees.

124.    Before Visa's public announcement in 2002 that it would not be competitively disadvantaged with respect to interchange, MasterCard's goal, as established by its management, was to maintain an interchange effective rate across all products (consumer credit, commercial credit, and debit) that was 3-5 basis points (.03-.05%) higher than Visa's overall effective rate. After Visa's announcement, MasterCard's goal has been to achieve parity with Visa, not only on an overall effective rate basis, but also on a product basis (consumer credit, commercial credit, and debit). In fact, MasterCard has attempted to maintain parity with Visa even within segments of these product areas. For example, MasterCard's World card and Visa's Signature card are comparable "premium card" products within consumer credit. MasterCard and Visa have attempted to maintain parity on the overall effective interchange rate for these two products.

125.    MasterCard and Visa not only establish matching effective interchange rates, but they also establish matching interchange rate structures. For example, both Visa and MasterCard have created four segments in their consumer credit group of products. Visa segments its consumer credit products into "traditional," "traditional with rewards," "Signature," and "Signature Plus." MasterCard has four similar segments, but they are called "core," "enhanced," "World," and "World Elite." These segments are based on the level of rewards associated with the product and the higher the level of rewards, the higher the interchange rate. Similarly, both Visa and MasterCard have created tiers within their interchange rate structures, whereby lower

interchange rates apply to high volume Merchants and higher interchange rates apply to lower volume Merchants.

126.    Therefore, virtually without exception, an interchange fee increase by either Visa or MasterCard is followed by a similar interchange fee increase by the other network. These collective acts are all manifestations of the effects of Duality.

127.    But for the conspiracy among Visa, MasterCard, and their member banks, Visa and MasterCard would have had an incentive to decrease interchange and merchant-discount fees to merchants – in order to increase or promote merchant acceptance of their respective payment cards.

128.    Duality has also facilitated a high degree of uniformity in the other Competitive Restraints described above that the Networks impose on merchants. This lack of significant non-price competition is evidence of collusion among the Defendants and maintains their monopoly power.

129.    A Visa transaction is indistinguishable from a MasterCard transaction. The transactions utilize the same relationships among the same member banks to provide the same method of payment to merchants. Because of this identity between products, Visa and MasterCard and their member banks should principally compete for merchant acceptance on price, including the price of payment card interchange fees, but they do not.

130.    The understanding between Visa and MasterCard is reinforced by both Networks' policies to discourage free-standing bilateral agreements between issuing banks and merchants.

131.    The understanding between Visa and MasterCard is further reinforced by both Networks' policies of discouraging competition between Visa and MasterCard for the provision of card-acceptance services to merchants by, for example, discouraging the development of

exclusive acceptance and preferential-acceptance deals between merchants and the Visa and MasterCard networks.

132.    Competitive Restraints Conclusion: The Competitive Restraints, individually and in combination, eliminate issuing bank competition for merchant acceptance. In the absence of these rules, the market for merchant acceptance would be competitive. Plaintiff would be able to gain the benefits of competition as to the terms under which it would accept an issuing bank's cards, including the amount of interchange fees — if any — Plaintiff would pay on transactions involving an issuing bank's cards. Competition among issuing banks for merchant acceptance would result in lower interchange fees for Plaintiff and enhance the value to cardholders.

133.    The Honor All Cards Rules, the No Discount Rules, the No Surcharges Rules, the All Outlets Rules, and Duality individually and in combination, eliminate the incentives for Visa, MasterCard, and the Bank Defendants to compete for merchant acceptance through setting lower "default" interchange fees.

134.    In addition to the Competitive Restraints, a variety of other rules and regulations (often not publicly disclosed) enforced by Visa and MasterCard and their member banks also operate to support the anticompetitive effects of the Competitive Restraints and imposition of "default" interchange fees on Plaintiff.

135.    The Competitive Restraints, including the collective setting of "default" interchange fees, are not reasonably necessary to accomplish any legitimate efficiency-generating objectives of the Visa, MasterCard, and Bank Defendants combinations in the general purpose payment card networks. Furthermore, numerous alternative means exist that would be less harmful to competition by which any such objectives could be accomplished.  In numerous instances, banks examined ways to differentiate their own cards from their competitors' at the

point of sale through arrangements with merchants that would have benefitted their cardholders. Even though such differentiation, *i.e.*, competition, was in the banks' individual interests, they did not engage in such competition because it was prohibited by Visa's and MasterCard's rules including, most notably, the Honor All Cards rules. That shows that the Honor All Cards rules and the supporting rules that barred any differentiation at the point of sale were not necessary for banks to issue payment cards. Domestic and international examples have also demonstrated that interchange fees are economically unnecessary to encourage Issuers to issue general purpose payment cards or for these payment systems to function. *A fortiori*, Issuers' collusively-fixed, supracompetitive interchange fees are unjustifiable.

136.    There are no procompetitive justifications for the Competitive Restraints. If merchants had not been restrained by these rules, some of them could have played Visa and MasterCard or the banks against one another by steering or threatening to steer customers away from using more expensive Visa and MasterCard credit and debit cards. Were it not for the Competitive Restraints, merchants could have used such tactics to try to negotiate more favorable terms from Visa or MasterCard or from individual Issuers. As a result, the Competitive Restraints, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

137.    The Defendants' exclusionary acts have continued to suppress competition in the market for merchant acceptance of credit cards and debit cards, and thereby have enabled Issuers to charge higher interchange fees and the Networks to charge higher network fees than they otherwise would have been able to charge merchants. Also, as a direct consequence of the Defendants' exclusionary conduct, Plaintiffs have been forced to incur substantial expenses in migrating their payment systems to the EMV technology which the Networks forced upon them

46

on pain of increased fraud liability. The Defendants' anticompetitive conduct has still further damaged Plaintiff by resulting in payment-fraud liability that it should not have incurred.

138.    The Defendants' exclusionary acts have also harmed consumers through higher prices and forcing on the marketplace technology (magnetic-stripe technology and signature authentication of transactions) that is significantly less secure and more prone to fraudulent transactions than alternatives (PIN authentication).

## C.    <u>Market Power</u>

139.    In addition to inflicting direct anticompetitive harm on merchants and cardholders with these conspiracies to fix prices and otherwise restrain competition, Defendants also have used the Competitive Restraints, including fixing interchange fees, to acquire and maintain their substantial market power. Specifically, Visa and MasterCard used supracompetitive interchange fees and the Competitive Restraints as an incentive for Issuers (who receive the interchange fees paid by merchants) to issue Visa and MasterCard credit cards and debit cards. Using price fixing to induce Issuers to join their cartels, Visa and MasterCard acquired sufficient market power in the credit and debit card markets such that most merchants were compelled to accept their cards for payment. Moreover, once a merchant started accepting Visa's and MasterCard's credit and debit cards for payment, it was virtually impossible to stop accepting them. Once Visa and MasterCard acquired substantial market power over merchants, they maintained it by forcing merchants to pay ever higher interchange fees to continue to fund these price-fixing schemes and thereby perpetually maintain and enhance their cartels' market power through the present day.

140.    Visa's and MasterCard's substantial market power has persisted since 2004 and remains intact today. In its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Company*, No. 10-cv-

4496-NGG-RER, (E.D.N.Y. Oct. 4, 2010), ECF No. 5, at 6, the United States Department of Justice Antitrust Division ("Antitrust Division") alleged that Visa and MasterCard possessed market power in the "network services market" for credit and debit cards. The non-discrimination restraints at issue in that case prevented merchants from "reduc[ing their] purchases of one network's services by encouraging [their] customers to choose a competing network's General Purpose Card." *Id.* at 7. Although a merchant could theoretically resist high acceptance fees by no longer accepting Visa's or MasterCard's credit or debit cards, the Antitrust Division recognized that the "all-or-nothing choice d[id] not effectively constrain Defendants' market power because merchants cannot refuse to accept these General Purpose Cards without alienating customers and losing significant sales." *Id.*

141. Visa's and MasterCard's ability to profitably impose supracompetitive interchange fees in the credit and debit card markets has also enabled them to exercise substantial market power on the cardholder side of the platform. Since 2004, those supracompetitive fees have maintained the cohesion of the conspiracies and lured additional banks to join the horizontal conspiracies not to compete and to fix prices. These conspiracies have ensured that banks have not competed on the basis of differentiating their offerings to cardholders through direct agreements with merchants that would have enabled such differentiation at the point of sale—differentiation that would have provided value to cardholders beyond what Issuers' rewards programs provide today. Cardholders have paid higher prices and received less choice and innovation as a result.

142. Visa's and MasterCard's substantial market power is also supported by direct evidence of that power. That evidence includes: (1) Visa's and MasterCard's ability to raise interchange fees and network fees without the loss of merchant acceptance or transaction

volume; (2) Visa's and MasterCard's ability to limit competition among Issuers that would have benefitted cardholders; (3) successful price discrimination; (4) setting interchange fees unrelated to costs; (5) the ability to enforce anticompetitive policies; and (6) forcing merchants and consumers to accept inferior products—including products that are susceptible to fraud.

143.    Visa and MasterCard have raised interchange fees without merchants ceasing to accept their credit and debit cards. In fact, the Networks typically gained volume after these increases. For example, the Networks permitted Issuers to reclassify standard credit cards as premium cards and, at the flip of a switch, the interchange fees that merchants paid for transactions made with such cards increased dramatically. Notwithstanding the vigorous merchant opposition to these punitive price increases, no merchant dropped Visa or MasterCard as a result.

144.    Visa's and MasterCard's rules have also prohibited Issuers from competing for cardholders by entering direct agreements with merchants that would have provided cardholders benefits, including lower prices, at the point of sale—benefits that would have gone beyond the rewards that Issuers offer cardholders today. Defendant's internal records show that individual Issuers wanted the ability to differentiate their products by entering into such agreements, and that because of Visa's and MasterCard's substantial market power in the credit and debit card markets, Issuers instead agreed to continue to abide by the conspiracies not to compete and to fix prices. They have done so because they continue to make more profits from supracompetitive, collusively-fixed interchange fees than they would from competing for cardholders through direct agreements with merchants. Visa's and MasterCard's ability to limit competition for cardholders—which has raised prices and limited the choices available to them—provides further evidence of their substantial market power.

145.    As one court has held, Visa's and MasterCard's "ability to price discriminate also illustrates their market power. Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. . . . Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar' merchants. [Visa and MasterCard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions." *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-41. This price discrimination persisted throughout the Damages Period and continues to this day.

146.    Visa and MasterCard do not set interchange fees based upon cost. For example, with respect to the debit card market, as noted above, the Federal Reserve found in 2011 that Visa's and MasterCard's Signature Debit Card and PIN Debit Card rates were substantially above cost. With respect to the credit card market, Issuers' costs of issuing credit cards are much lower than the very high interchange fees that prevail in the United States (even including Issuers' costs of providing cardholder rewards). Visa's and MasterCard's ability to succeed in this conduct and profit from it, including by limiting Issuer competition for cardholders, is additional direct evidence of their substantial market power.

147.    Visa's and MasterCard's successful enforcement of anticompetitive rules and policies that harmed merchants and consumers without losing merchant acceptance or transaction volume, or incurring any bank defection from the cartels, further demonstrates the substantial market power that Visa and MasterCard had, and still have, in the credit and debit card markets. Despite the adverse economic impact of these rules and policies on merchants,

their customers and cardholders, merchants could not afford to stop accepting Visa or MasterCard transactions, and no Issuer defected from the cartels, because of Visa's and MasterCard's substantial market power.

148.    Visa's and MasterCard's ability to impose inferior-quality card products and to permit preventable fraud is further direct evidence of their substantial market power. Despite the availability of technology to reduce fraud, Visa, MasterCard, and their owner/member banks had no incentive to adopt it in the United States or compete using better technology, because they could, and did, shift fraud-related costs to merchants and further profit from fraud while insulating the banks from its costs. To the extent that Plaintiffs and their customers were forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages that flow from the conspiracies.

149.    In 2001, in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court found that Visa had market power in the market for credit card network services with a 47% share of the dollar volume of credit card transactions in the United States. In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court reaffirmed that Visa had market power in the credit card market based on a finding that its market share fluctuated between 43% and 47%, as well as the barriers to entering the relevant product market. Visa's share of the credit card market has not changed significantly since these two holdings. The prior judicial findings of market power demonstrate that Visa has market power in the credit card network services market.

150.    There are significant barriers to entry into the market for credit cards. Indeed, the court in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344

F.3d 229 (2d Cir. 2003), specifically found that there are high barriers to entry into the credit card market. Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion. Both AT&T and Citibank conducted entry analyses, but decided it would be unprofitable to attempt to start a competing credit card business.

151.    The difficulties associated with entering the credit card market are exemplified by the fact that no company has entered since Discover did so in 1985. Discover has never achieved more than a 7% share of the credit card market and its current share is approximately 5%.

152.    In *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court held that MasterCard's 26% share of dollar volume of credit and charge card transactions was sufficient to demonstrate that it had market power in the market for credit card network services. In *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court held that MasterCard's 26% to 28% share of the credit card market was sufficiently high to go to a jury on the question of MasterCard's market power. MasterCard's share of the credit card market has not changed significantly since those decisions.

153.    MasterCard's "default" credit interchange fees also demonstrate MasterCard's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen. Despite these increases, merchants have not stopped accepting MasterCard credit cards. Further, MasterCard's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

154.     Visa, jointly with its issuing banks, and MasterCard, jointly with its issuing banks, each also exercise market power in the market for debit cards in the United States and its territories, certainly including Texas.

155.     The debit card market is dominated by Visa and MasterCard. Combined, Visa and MasterCard comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today. Only Visa, MasterCard, and Discover allow signature authorization of debit transactions. Visa and MasterCard have exercised and continue to exercise market power by requiring Plaintiff to pay supracompetitive interchange fees and by imposing the Competitive Restraints on Plaintiff.

156.     Visa and MasterCard each participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa-branded debit cards or MasterCard-branded debit cards. This combination of issuing banks, including the Bank Defendants, combined with the Competitive Restraints gives Visa and MasterCard market power. Visa and MasterCard have exercised and continues to exercise market power by requiring Plaintiff to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

157.     Visa's and MasterCard's market power over merchants in the debit card market is demonstrated by the fact that, when the ties forcing merchants to accept Visa and MasterCard debit cards as a condition of accepting Visa or MasterCard credit cards were dropped in 2003, there is no evidence that merchants were able to stop accepting Visa or MasterCard debit cards despite the availability of lower cost PIN debit networks. In addition, in 2011 the Federal Reserve Board found that Visa's and MasterCard's debit interchange rates were significantly above cost. Because of Visa's, MasterCard's, and the Bank Defendants' Competitive Restraints,

merchants and consumers cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

158.    Issuers have strong economic incentives to issue debit cards even without income from interchange fees. Debit cards provide numerous economic benefits to Issuers that justify their issuance even without interchange fees. These benefits include: (1) savings relative to the costs of processing checks and cash; (2) motivating cardholders to maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuer to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards. Moreover, issuance of debit cards enhances the "stickiness" of the Issuer's valuable relationship with its customers.

159.    The substantial non-interchange economic benefits of issuing debit cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on debit card interchange fees in the United States pursuant to the Durbin Amendment. Addressing that impending regulatory cap, the CEO of Citigroup said: "We don't have much of an impact on debit card interchange or overdraft fees. Those are really small impacts on us." Citigroup Inc. Q4 2010 Earnings Call Transcript (Jan. 18, 2011). The Chairman and CEO of City National Corporation predicted: "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material." City National Corporation Q4 2010 Earnings Call Transcript (Jan. 20, 2011). TCF Financial Corp.'s Chairman and CEO added that "[w]e'll obviously still be profitable" even if there is a cap imposed on debit Interchange Fees. Transcript to TCF Financial Corp.'s Conference Call, *TCF Discusses Lawsuit Challenging Durbin Amendment* (Oct. 12, 2010).

160.    The facts that debit card issuance continues to be profitable and that debit volumes have increased since debit card interchange fees for regulated banks declined

significantly beginning in late 2011 reinforce the conclusion Visa and MasterCard, along with their issuing member banks, each have market power in the debit card market, including both merchant acceptance of debit cards and cardholder issuance of credit cards.

## D.   <u>Competitive Injury</u>

161.   Defendants' anticompetitive conduct has generated more than $450 billion in interchange fees for the colluding Issuers since 2004—fees paid by merchants such as Plaintiff and their customers.  Merchants and their customers continue to pay them to this day.  From 2004 to the present, Plaintiff has accepted Visa-branded and MasterCard-branded credit and debit cards at its restaurants and sues only for antitrust injuries related to purchases by customers using credit and debit cards issued to them in the United States.

162.   Defendants' price-fixing cartels and monopolistic conduct have caused substantial and ongoing anticompetitive harm to Plaintiff as a direct purchaser of payment card network services, in the form of inflated interchange fees paid directly by Plaintiff, foreclosure of network competitors, and reduced output. Defendants' inflated interchange fees for rewards cards have not resulted in incremental sales at Plaintiff's restaurants. To the contrary, rewards cards have harmed Plaintiff because they incentivize consumers to use higher-priced rewards cards when consumers would otherwise have spent the same amount using lower-cost credit cards. Plaintiff and its customers have borne—and continue to bear—the brunt of tens of millions of dollars of supracompetitive fees and severely decreased consumer welfare.

163.   Defendants' price-fixing cartels have also caused substantial and ongoing anticompetitive harm to cardholders in the form of reduced choices and innovation, higher prices, reduced output, and increased payment fraud. The Defendants' monopolistic conduct has exacerbated that consumer injury through increased fraud and higher costs that are borne by

consumers. Contrary to Defendants' claims that supracompetitive interchange fees are justified by cardholder rewards programs, those programs would continue to exist in the absence of Defendants' unlawful price fixing and agreement not to compete for merchant acceptance. Moreover, Issuers' competition for merchant agreements would create cardholder rewards and discounts beyond those offered by Issuers today. Defendants' foreclosure of that competition has therefore harmed cardholders.

164.   Visa's and MasterCard's interchange fee increases outweighed any benefit that the Defendants claim those increases provided cardholders. Although Defendants have historically claimed that interchange fees are simply passed through to cardholders as rewards, the Bank Defendants keep at least half the interchange fees they receive as supracompetitive profits.

165.   Plaintiff has suffered direct antitrust injury from Defendants' conduct in violation of the Sherman Antitrust Act and the Texas Free Enterprise and Antitrust Act. Plaintiff has directly paid the applicable interchange fees to the relevant Issuer with respect to transactions in which a Plaintiff accepted a Visa or MasterCard credit or debit card as a method of payment. As a result, Plaintiff has paid (and continues to pay) substantial, unlawful overcharges is a direct result of the Defendants' agreements not to compete, price fixing and monopolization set out in this Complaint. Plaintiff also has been (and continues to be) deprived of the benefits of competition limited by this conduct in the relevant markets.

166.   Because the supracompetitive interchange fees that Plaintiff had to pay were a substantial cost of doing business, Plaintiff was forced to raise its prices paid by its customers or to reduce retail services provided to its customers as a means of offsetting these interchange fees. As a result, retail sales were below what they would have been, which reduced output and

thereby harmed the economy.  Moreover, as evidenced by the impact on merchant acceptance of the mandated interchange fee reductions in Australia and Europe, inflated interchange fees also artificially reduce merchant acceptance of credit and debit cards. These reductions in retail sales and merchant acceptance, coupled with the limitations on competition from other networks resulting from Defendants' anticompetitive conduct, significantly reduced output below what it would have been. By imposing a massive and hidden tax on both merchants and consumers, Defendants' conduct decreased cardholder welfare and imposed substantial anticompetitive harm.

167.    Moreover, because of the conduct detailed in this Complaint, Plaintiff could not limit these higher retail prices to customers using the Visa and MasterCard credit and debit cards that generated the underlying interchange fees.  All customers, including less affluent ones who are more likely to pay with cash, had to bear the cost of these inflated interchange fees in the form of higher retail prices or reduced retail services.

168.    Further, the imposition of supracompetitive interchange fees distorted Issuer incentives in both markets, resulting in decreased choices for cardholders and the perpetuation of the fraud-prone magnetic-stripe system in the United States. This diminution of quality and innovation for cardholders is a further harm to competition.

## CLAIMS FOR RELIEF

**COUNT I: Agreements in restraint of trade and unlawful price fixing of Visa's credit card interchange fees in violation of Section 1 of the Sherman Antitrust Act**

169.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

170.    The use of credit cards issued by members of Visa, including the Bank Defendants, and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on commerce in the United States.

171.    Visa and its member banks, including the Bank Defendants, are a combination within the meaning of the Sherman Antitrust Act. Visa's rules and related contracts constitute agreements and/or conspiracies within the meaning of the Sherman Antitrust Act. Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members, including the Bank Defendants, both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among the Bank Defendants and other member banks, which would otherwise compete for merchant acceptance of the credit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

172.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks, including the Bank Defendants, have never withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.

Nor did the Bank Defendants take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

173.   The price-fixing conspiracy and agreement not to compete were *per se* violations the Sherman Antitrust Act. Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of the Sherman Antitrust Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

174.   Alternatively, the Competitive Restraints constitute vertical agreements in restraint of trade.  Visa entered into express vertical agreements with each of its owner/member banks, binding all of its owner/member banks to comply with the rules and regulations of its network, including the rules at issue in this Complaint. In turn, Visa acts as the enforcement agent and holds its issuing and acquiring members responsible for compliance with the rules. These vertical price restraints have continued in full effect, including after Visa's IPO.

175.   For example, the "General Overview" of the April 10, 2011 *Visa International Operating Regulations* states: "The *Visa International Operating Regulations* are set and modified by Visa to support the use and innovation of Visa products and services, and represent a binding contract between Visa and all Members." Visa's current rules contain virtually identical "binding contract" language.[11]

176.   As alleged above, Visa and its members, including the Bank Defendants, jointly have market power in the relevant market.

177.   Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded credit cards and to prevent the

---

[11] *See* Introduction, *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016).

operation of and interfere with the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of the Sherman Antitrust Act.

178.    The Competitive Restraints, described above, eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks. This further eliminates merchant acceptance as one of the areas of competition among issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards and cardholders would have received more value, choice, and innovation.

179.    Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Visa and the Bank Defendants' Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and decreased consumer welfare.

180.    The Defendants' conspiracy harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

181.    The Defendants' illegal conduct has been willful and/or flagrant.  Therefore, Plaintiff is entitled to treble damages, including reasonable attorney fees according to the Sherman Antitrust Act.

182.    Plaintiff has suffered and will continue to suffer irreparable harm due to Defendants' illegal conduct that cannot be adequately compensated with money damages. Because Plaintiff's legal remedy will not be adequate to compensate for irreparable injuries inflicted by Defendants, Plaintiff is entitled to permanent injunctive relief.

## COUNT II: Agreements in restraint of trade and unlawful price fixing of Visa's debit card interchange fees in violation of Section 1 of the Sherman Antitrust Act

183.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

184.    The use of debit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on commerce in the United States.

185.    Visa and its member banks, including the Bank Defendants are a combination within the meaning of the Sherman Antitrust Act. Visa's rules and related contracts with its members, including the Bank Defendants, constitute agreements and/or conspiracies within the meaning of the Sherman Antitrust Act. Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members, including the Bank Defendants, both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition between the bank members of the combination through the rules governing debit cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members and the Bank Defendants, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks, including the Bank Defendants to forgo the ability to compete for

merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

186.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks, including the Bank Defendants, have never withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members, including the Bank Defendants, take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rule and agreements.

187.    The price-fixing conspiracy and agreement not to compete were *per se* violations of the Sherman Antitrust Act. Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of the Sherman Antitrust Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

188.    Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

189.    As alleged above, Visa and its members, including the Bank Defendants, jointly have market power in the market for debit card network services.

190.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of the Sherman Antitrust Act.

191.    The Competitive Restraints, described above, eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

192.    Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of Visa and the Bank Defendants' Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and increased prices.

193.    The Defendants' conspiracy harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

194.    The Defendants' illegal conduct was willful and/or flagrant.  Therefore, Plaintiff is entitled to treble damages, including reasonable attorney fees according to the Sherman Antitrust Act.

195.    Plaintiff has suffered and will continue to suffer irreparable harm due to Defendants' illegal conduct that cannot be adequately compensated with money damages. Because Plaintiff's legal remedy will not be adequate to compensate for irreparable injuries inflicted by Defendants, Plaintiff is entitled to permanent injunctive relief.

**COUNT III: Agreements in restraint of trade and unlawful price fixing of MasterCard's credit card interchange fees in violation of Section 1 of the Sherman Antitrust Act**

196.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

197.    The use of credit cards issued by members of MasterCard, including the Bank Defendants and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on commerce in the United States.

198.    MasterCard and its member banks including the Bank Defendants are a combination within the meaning of the Sherman Antitrust Act. MasterCard's rules and related contracts constitute agreements and/or conspiracies within the meaning of the Sherman Antitrust Act. MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members, including the Bank Defendants, both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among the Bank Defendants and its other members, which would otherwise compete for merchant acceptance of the credit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks and Bank Defendants, managed by MasterCard, similarly not to compete.

199.    In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks, including the Bank Defendants, have never withdrawn. In changing its ownership

structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did the Bank Defendants take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

200.    The price-fixing conspiracy and agreement not to compete were *per se* violations of the Sherman Antitrust Act. Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of the Sherman Antitrust Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

201.    Alternatively, the Competitive Restraints constitute vertical agreements in restraint of trade. MasterCard entered into express vertical agreements with its owner/member banks, binding all of its owner/member banks to comply with the rules and regulations of its network, including the rules at issue in this Complaint. In turn, MasterCard acts as the enforcement agent and holds its issuing and acquiring members responsible for compliance with the rules. This vertical price restraint has continued in full effect, including after MasterCard's IPO. Rule 1.3 of the July 15, 2011 *MasterCard Rules* states: "An applicant to be a Member must agree, and by execution and submission of an application to be a Member agrees, that it will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation." In turn, "Standards" is defined as: "The Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the operating regulations and procedures of the Corporation, including but not limited to any manuals, guides or bulletins, as may be amended

from time to time." *See* Definitions, *MasterCard Rules* (July 15, 2011). MasterCard's current rules are largely the same.[12]

202.    As alleged above, MasterCard and its members, including the Bank Defendants, jointly have market power in the relevant market.

203.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of MasterCard-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of credit cards, in violation of the Sherman Antitrust Act.

204.    The Competitive Restraints, described above, eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks. Absent these rules, merchants would have been able to (and  would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

205.    Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of MasterCard and the

---

[12] *See, e.g.*, MasterCard Rule 1.6 (The License), Ch. 1—The License and Participation ("Each Customer agrees, and by use of any one or more of the Marks agrees, to comply with all provisions of the License pertaining to use of the Marks and with the Standards of this Corporation …."); Appendix C (Definitions) (defining "Customer" as "[a] financial institution or other entity that has been approved for Participation;" "License" as "[t]he contract between the Corporation and a Customer granting the Customer the right to use one or more of the Marks in accordance with the Standards;" and "Standards" as "[t]he organizational documents, operating rules, regulations, policies, and procedures of the Corporation, including but not limited to any manuals, guides or bulletins . . ."), *MasterCard Rules* (July 7, 2016).

Bank Defendants' Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and increased prices.

206.    The Defendants' conspiracy harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

207.    The Defendants' illegal conduct was willful and/or flagrant.  Therefore, Plaintiff is entitled to treble damages, including reasonable attorney fees according the Sherman Antitrust Act.

208.    Plaintiff has suffered and will continue to suffer irreparable harm due to Defendants' illegal conduct that cannot be adequately compensated with money damages. Because Plaintiff's legal remedy will not be adequate to compensate for irreparable injuries inflicted by Defendants, Plaintiff is entitled to permanent injunctive relief.

**COUNT IV: Agreements in restraint of trade and unlawful price fixing of MasterCard's debit card interchange fees in violation of Section 1 of the Sherman Antitrust Act**

209.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

210.    The use of debit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on commerce in the United States.

211.    MasterCard and its member banks, including the Bank Defendants, are a combination within the meaning of the Sherman Antitrust Act. MasterCard's rules and related contracts with its members, including the Bank Defendants, constitute agreements and/or conspiracies within the meaning of the Sherman Antitrust Act. MasterCard's Competitive

Restraints, as defined above, constitute horizontal agreements among MasterCard and its members, including the Bank Defendants, both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing debit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members and the Bank Defendants, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks, including the Bank Defendants, to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, to similarly not compete.

212. Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix price of acceptance of MasterCard-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of the Sherman Antitrust Act.

213. The Competitive Restraints, described above, eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

214. Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of MasterCard and the Bank Defendants' Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and increased prices.

215. The Defendants' conspiracy also harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

216. The price-fixing conspiracy and agreement not to compete were *per se* violations of the Sherman Antitrust Act. Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of the Sherman Antitrust Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

217. The Defendants' illegal conduct was willful and/or flagrant. Therefore, Plaintiff is entitled to treble damages, including reasonable attorney fees according to the Sherman Antitrust Act.

218. Plaintiff has suffered and will continue to suffer irreparable harm due to Defendants' illegal conduct that cannot be adequately compensated with money damages. Because Plaintiff's legal remedy will not be adequate to compensate for irreparable injuries inflicted by Defendants, Plaintiff is entitled to permanent injunctive relief.

**COUNT V: Monopolization by Visa and Bank Defendants in violation of Section 2 of the Sherman Antitrust Act**

219. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

220.    Visa has monopoly power in the relevant markets in the United States, including Texas.

221.    The Competitive Restraints further and protect Visa's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient credit card services to merchants. The adoption, imposition, and enforcement of the Competitive Restraints constitute willful maintenance of monopoly power, which harms the competitive process and consumers, in violation of the Sherman Antitrust Act.

222.    No procompetitive justification exists for the Competitive Restraints.

223.    As a direct and foreseeable result of Visa's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Competitive Restraints, Plaintiff has suffered threatened and actual injury to its business and property.

224.    As a direct and foreseeable result of Visa's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Competitive Restraints, Plaintiff has also suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

225.    The Defendants' monopolization has harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

226.    Visa's monopolization has affected commerce in the United States, including Texas.

227.    The conduct described herein is likely to continue unless enjoined.

228.    The Defendants' illegal conduct was willful and/or flagrant.  Therefore, Plaintiff is entitled to treble damages, including reasonable attorney fees according to the Sherman Antitrust Act.

229.    Plaintiff has suffered and will continue to suffer irreparable harm due to Defendants' illegal conduct that cannot be adequately compensated with money damages. Because Plaintiff's legal remedy will not be adequate to compensate for irreparable injuries inflicted by Defendants, Plaintiff is entitled to permanent injunctive relief.

**COUNT VI:  Monopolization by MasterCard and Bank Defendants in violation of Section 2 of the Sherman Antitrust Act**

230.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

231.    MasterCard has monopoly power in the relevant markets in the United States, including Texas.

232.    The Competitive Restraints further and protect MasterCard's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient credit card network services to merchants. The adoption, imposition, and enforcement of the Competitive Restraints constitute willful maintenance of monopoly power, which harms the competitive process and consumers, in violation of the Sherman Antitrust Act.

233.    No procompetitive justification exists for the Competitive Restraints.

234.    As a direct and foreseeable result of MasterCard's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Competitive Restraints, Plaintiff has suffered threatened and actual injury to their business and property.

235.    As a direct and foreseeable result of MasterCard's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Competitive Restraints, Plaintiff has also suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

236.    The Defendants' monopolization has harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

237.    MasterCard's monopolization has occurred in and affected commerce in the United States.

238.    The conduct described herein is likely to continue unless enjoined.

239.    The Defendants' illegal conduct has been willful and/or flagrant.  Therefore, Plaintiff is entitled to treble damages, including reasonable attorney fees according to the Sherman Antitrust Act.

240.    Plaintiff has suffered and will continue to suffer irreparable harm due to Defendants' illegal conduct that cannot be adequately compensated with money damages. Because Plaintiff's legal remedy will not be adequate to compensate for irreparable injuries inflicted by Defendants, Plaintiff is entitled to permanent injunctive relief.

**COUNT VII:  Violation by All Defendants of the Texas Free Enterprise and Antitrust Act of 1983, Texas Business and Commerce Code Section 15.01, et seq.**

241.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

242.    Defendants' conduct and violations described above in each of the foregoing Counts, including but not limited to entering into agreements in restraint of trade,

monopolization and anticompetitive practices, also constitute violations of the Texas Free Enterprise and Antitrust Act of 1983 and have caused Plaintiff substantial damages.

243.    Plaintiff is entitled to its actual damages, injunctive relief, and reasonable attorney's fees according to Section 15.21(a)(1) of the Texas Business and Commerce Code. Since Defendants' illegal conduct has been willful and/or flagrant, Plaintiff is also entitled to treble damages according to Section 15.21(a)(1) of the Texas Business and Commerce Code.

### JURY DEMAND

244.    Plaintiff demands a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Judgment in favor of Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    An award of the cost of the suit, including a reasonable attorney's fee;

C.    Order that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of the Texas Free Enterprise and Antitrust Act of 1983 and the Sherman Antitrust Act, in which they and co-conspirators have been engaged; and

D.    Such other and further relief as the Court deems just, equitable, and proper.

Dated: November 26, 2018

Respectfully submitted,

BURDINE WYNNE LLP

   /s/ David E. Wynne
David E. Wynne  (Attorney-in-Charge)
Texas Bar No. 24047150
Federal Bar No. 566468
1415 Louisiana St., Suite 3900
Wedge International Tower
Houston, TX 77002
(713) 227-8835 (Telephone)
(713) 227-6205 (Facsimile)
dwynne@burdinewynne.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Scott G. Burdine
Texas Bar No. 03368900
Federal Bar No. 10148
Kenneth R. Wynne
Texas Bar No. 22110000
Federal Bar No. 00837
BURDINE WYNNE LLP
1415 Louisiana St., Suite 3900
Wedge International Tower
Houston TX 77002
(713) 227-8835 (Telephone)
(713) 227-6205 (Facsimile)
kwynne@burdinewynne.com
sburdine@burdinewynne.com

## CERTIFICATE OF CONFERENCE and WRITTEN CONSENT

I certify that, without waiving any applicable defenses or arguments, Defendants have provided written consent to Plaintiff's filing this Second Amended Complaint according to Federal Rule of Civil Procedure 15(a)(2).

   /s/ David E. Wynne
David E. Wynne

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically transmitted this document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all counsel of record on the date of filing November 26, 2018.

_/s/ David E. Wynne_____
David E. Wynne